PEOPLE OF PORTO RICO, Plaintiff and Appellee, *v.* RAMÓN RAMÍREZ-FIGUEROA, Defendant and Appellant.

No. 3110.   Argued May 18, 1927.—Decided July 7, 1927.

*P. Fajardo Martínez, Pedro Nelson Colberg* and *Pedro Baiges Gómez* for the appellant.   *José E. Figueras* for the appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the court.

Appellant was convicted of voluntary manslaughter and says that: The verdict and judgment are contrary to law and to the evidence adduced at the trial (*a*) because the proof presented by the prosecution was insufficient to justify such verdict and judgment; (*b*) because there was no proof that "death was the proximate and sole result" of the wound inflicted by appellant (assuming that it was so inflicted); (*c*) because the jury and the court below disregarded the evidence adduced by• defendant tending to show that the wound in question was accidental and received under circumstances involving no criminal responsibility on the part of defendant, and (*d*) because it was not shown that the death of Herminio Rosario, if caused by defendant, was illegally or negligently so caused.

The first witness for the prosecution, Roque López, was in a room with a window or doorway opening upon a narrow alley between two houses. Defendant occupied a room on the opposite side of this alley, or adjoining a courtyard to

which the alley gave access. On direct examination, López says that Herminio Rosario passed through the alley to the doorway opening on the *patio* between the two houses; that witness heard a shot and that Rosario fell in the doorway of the room occupied by witness; that witness did not see who fired the shot nor the firearm, but saw "him (accused) and his sister" when they came to the assistance of the wounded man, and that witness heard no dispute, struggle, fight or riot.

On cross-examination this witness states that he knew defendant was in his house because he came out and said: "What is the matter, boy; what has happened to you? That is nothing;" that Rosario arrived about half past three o'clock and was there for some time playing with defendant in the *patio;* that the two were playing as if in dispute; that Rosario was joking the defendant; that Rosario was at the door of defendant's room and he came forward and said to Herminio: "You would not shoot anything," and witness said: "Go ahead, *compadre,* go ahead, *que un tiro se le sale a cualquiera que fuera"* and he repeated "no, this fellow won't shoot anything, he is a coward;" that they were disputing as if in fun; that the distance between defendant and witness was about five meters; that Rosario had been drinking and whenever he was drinking he was in a good humor; that when the shot was fired, Rosario fell at the door of the room occupied by witness; that Herminio had nothing in his hands.

The testimony of the physician who performed the autopsy leaves little room for doubt that death ensued as the result of the wounds.

Defendant went at once to police headquarters and reported the fact that he had wounded Rosario. A policeman went to the scene of the shooting and the defendant's mother delivered to him a shotgun and an empty shell.

The testimony of the physician also indicated that the

shot wounds were scattered over a considerable area. The shirt and undershirt worn by Rosario at the time of the shooting were introduced in evidence.

Another witness, José Luciano, testified, without objection on the part of defendant, to a statement said to have been made by Rosario while his wounds were being dressed at the hospital, to the effect that he had visited the house of Juan Ramírez, father of defendant, had found defendant in his room as usual and, the two being friends, had touched defendant who was surprised, and Rosario hid himself in another room; that defendant suspected or supposed that it was "Dominica" who was joking with him and returned to his bed saying to Rosario that if he came again with his "music" defendant would shoot him and he did it.

The testimony for the defense tended to show that Rosario was playfully pointing the gun at defendant, who thereupon tried to take it from him and that the weapon was accidentally discharged during the struggle for possession thereof. But a physician who took the stand for the defense testified that the wounds upon the body of deceased covered an area of some five or six or seven inches in diameter. This witness said that there were no powder marks on the skin of deceased, and found none on the shirt and the undershirt when he examined them in the presence of the jury. Although disclaiming any pretention as an expert and declining to fix distances with absolute exactitude, this witness confessed to a fondness for hunting and to a more or less varied experience with shotguns as well as with shotgun wounds. He was quite positive that powder marks would be made, not only on the clothing, but also on the skin, at a distance of less than three feet; that a charge of shot at close range would not scatter, but would tear a hole in the target, and that the wounds upon the body of deceased were received at a distance of from three to seven feet from the muzzle.

The jury viewed the premises, and measurements were

taken of distances between the different spots indicated by witnesses as those referred to in their testimony.

We can not agree with appellant that the verdict and the judgment are contrary to the law and the evidence.

There is no separate assignment of error, but the second, third and fourth propositions submitted by appellant are, in substance, that the court below erred in admitting in evidence the dying declaration of Herminio Rosario, in admitting a specified question and answer, and in excluding evidence as to the dangerous and quarrelsome character of Rosario.

Francisco Montalvo Colberg, Municipal Judge of Cabo Rojo, in his testimony, mentioned two visits, two conversations and two statements reduced to writing in the form of dying declarations several hours after the shooting. The first interview was had about seven-thirty in the evening in the presence of an attending physician and the second about nine o'clock in the presence of the chief of police and the secretary of the municipal court.

The second of these two statements was first offered in evidence, after an unsuccessful effort to show that it had in fact been made as a dying declaration, and was very promptly and properly excluded by the trial judge. The district attorney then attempted to get the earlier statement before the jury, not as a dying declaration but as a part of the *res gestae*. This attempt was equally unsuccessful, and the matter became, temporarily at least, a closed incident.

The next witness to take the stand was a policeman, Remedio López, who was about to testify, not to either of the matters mentioned by the municipal judge, but to a conversation referred to as having occurred within four or five minutes after the shooting, when the incident relied upon by appellant as a third ground of appeal arose. The record at this point reads thus:

"What was the declaration made by Herminio Rosario to you? (Defense) I object to the witness answering that question. (Judge)

Four or five minutes afterwards—let us see. (Defense) We are going to state the grounds of our objection. The Supreme Court of California at page 190 of Kerr's Cyc. Penal Codes of California has held as follows: 'Evidence of police officer, to effect that after shot he ran to place where deceased was lying and had conversation with her for possibly half-minute or little longer, in which she declared that defendant was man who had shot her, is inadmissible, where such declaration is not made in defendant's presence, and no foundation is laid for it as dying declaration.' (Prosecution) As dying declaration, but not as part of the *res gestae*. (Judge) Admitted; the witness may testify.''

The question was then repeated and counsel expressed a desire to know whether the witness meant to say that the conversation occurred four or five minutes after his arrival at the hospital or four or five minutes after the shooting. Thereupon the court came to the rescue and of its own motion told the district attorney that he must show in detail, and if necessary by other witnesses, everything that had occurred or was done during the time that had elapsed between the moment of the shooting and the moment of the conversation in question, so that the court could gather from the circumstances a more definite idea of the situation and draw its own conclusions.

After several pages of inquiry along the lines indicated by the trial judge, we find the following:

''(Prosecution) With that preliminary evidence we submit as part of the *res gestae* the testimony of the witness. (Judge) The witness starts with the statement that the defendant presented himself in the police station; the time elapsed between the event and the appearance of the defendant in the police station has not been shown. (Prosecution) Let us leave that to be determined later on. (Judge) Bring all your witnesses, the persons who carried the wounded man to the municipal hospital, and those who were there before the introduction of the witness Remedio López. (Prosecution) I am going to introduce a single witness for that purpose because I have discovered that the information did not name other witnesses and I have had to produce the rest of the evidence. (Defense) We reserve the right to cross-examine the witness when the fiscal is through

with him. (Judge) As regards the preliminary question as to whether it forms part of the *res gestae* the witness may be examined now as we are just on the preliminaries. (Defense) Then as regards the preliminary question we may cross-examine the witness. (Judge) Yes, you may cross-examine the witness on that point.''

After some ten or twelve pages of cross-examination the witness, Remedio López, was permitted to retire from the stand while several other witnesses were examined at length as to the circumstances surrounding the removal of the wounded man to the hospital. Then, before Remedio López resumed his narrative, came the incident relied upon by appellant to show the admission in evidence of the dying declaration made before the Municipal Judge of Cabo Rojo.

It began with the announcement by the *fiscal* that he had no more preliminary proof to offer. This was followed by an inquiry from the Bench as to whether or not there was any objection to the admission ''of the statement made by deceased as a part of the *res gestae*.'' Thereupon counsel for the defense argued as to the sufficiency of the showing made by the *fiscal*, in a manner that leaves no room for doubt either as to the fact that the admissibility of the statement made by Rosario in the presence of Remedio López immediately upon arrival at the hospital was the matter under consideration or as to the further and more significant fact that the counsel was not at the time laboring under any confusion or misapprehension or false impression in this regard.

The second and third grounds of appeal, already referred to, are thus set forth in the brief:

''Second. The trial court erred in admitting as evidence the 'dying declaration' of Herminio Rosario over defendant's objection and exception, as shown by the following extract from the record:

'' 'At the termination of his preliminary evidence the district attorney offers in evidence the declaration made by the deceased to the Municipal Judge of Cabo Rojo. The judge asks defendant's attorney whether there was any objection and he answers: We are going to object to the admission of that declaration as part of the

*res gestae* on the grounds set forth in the record.

" 'The court admits the evidence and the defense takes an exception.

" 'The declaration is subsequently introduced in evidence.'

"Third. The trial court erred in admitting as evidence the following question and answer:

" ' 'Question propounded by the district attorney: What was the declaration made to you by Herminio Rosario? (Defense) I object to the witness answering; we are going to support our objection, etc. (District Attorney) As dying declaration, but not as part of the *res gestae*. (Judge) Admitted; the witness may testify.' ' '

The argument of counsel before the court below as to the admissibility of the testimony of the policeman, Remedio López, concerning the statement made by Rosario upon his arrival at the hospital is taken *verbatim* from the stenographic record and embodied in the brief for appellant as referring to the proposed admission in evidence of the so-called dying declaration made before the municipal judge several hours after the interview with the policeman.

Comment upon such tactics would seem to be superfluous.

The stenographic record contains no reference whatever to the so-called dying declaration from and after the time when it was twice offered in evidence by the district attorney and twice excluded by the trial judge. Nevertheless, the document is tacked on at the end of that record, and referred to by the stenographer as having been admitted by the court. Incidentally, it follows immediately the ruling relied upon by appellant as excluding the evidence of Rosario's bad character, although the court, according to the letter of the transcript, ruled that this evidence was admissible.

Appellant, commenting upon the self-evident incongruity between the statement imputed to the trial judge by the transcript and the context, insists that the evidence in question was in fact excluded as shown by the exception taken by the defendant at the time.

It is perfectly plain that the incident here referred to involved the admissibility of evidence tending to show the

previous record and bad conduct of Rosario. The municipal judge had been called to the stand a second time as a witness for the defense upon this point and there is not the remotest reference anywhere in the examination of this witness at this time to a dying declaration or to any statement made by Rosario. We are inclined, therefore, to agree with appellant that the trial judge probably said in the ruling here complained of that the evidence which defendant was attempting to introduce was "inadmissible," not that the same, or some other evidence no tender of which had been made upon this occasion, was "admissible." Nevertheless, and curiously enough, immediately following the exception taken by defendant to this ruling, the transcript recites that "the evidence admitted by the court, literally copied reads as follows:" Then comes the so-called dying declaration said in a postscript signed by the municipal judge, by the secretary of the municipal court and by the district chief of police to have been made before these officials.

The trial judge, in the absence of any objection or criticism on the part of the attorney for appellant who took no part in the trial, or by the district attorney who had conducted the case for The People, approved this transcript, without modification or amendment, as certified by the stenographer and submitted by the parties.

For the purposes of this opinion, therefore, it may be conceded that the recrudescent dying declaration was admitted in evidence by the court below, or that in some mysterious way either during or after the trial it became a document in the case. The fact remains that no objection was ever made to the admission of such evidence at the time of its admission, nor was an exception taken by defendant to any ruling of the court in this regard.

The fourth proposition relied upon by appellant is somewhat more plausible. But the error, if any, is not shown to have prejudiced defendant in any substantial right. Conced-

ing for the sake argument, without holding, that the better practice would have been to permit defendant to show the previous record and bad conduct of Rosario, yet in the circumstances of this particular case we are not disposed to reverse the judgment upon that ground alone. If, as claimed by defendant, Rosario was pointing a loaded gun at him, then defendant was sufficiently justified in attempting to wrest the weapon from the hands of Rosario and would have been justified for that matter in killing Rosario if necessary in the attempt. It is not pretended that Rosario was seeking a quarrel or that he had any intention of assaulting or doing bodily harm to defendant.

On the contrary, all the evidence in the case points conclusively to the fact that Rosario was in excellent spirits and that his attitude was friendly and playful. Thus it seems reasonably clear that the action of defendant was not influenced or prompted in any appreciable degree by the fact, if it be a fact, that Rosario was a dangerous or quarrelsome character, even though his previous record in this regard was known to defendant at the time.

There was no offer or intimation of a purpose on the part of defendant to prove that he knew Rosario to be a dangerous man and unless he had such knowledge, the evidence of that character or previous conduct was clearly irrelevant and immaterial. And in so far as such character and conduct if known to defendant, might have been regarded as an extenuating circumstance, the jury seems to have given defendant the full benefit of any doubt upon this point in its recommendation of clemency, which in turn seems to have received favorable consideration by the trial judge in imposing a sentence of two years and six months in the penitentiary.

What we have said would suffice to dispose of the present appeal as presented by the brief for appellant, but the *fiscal*

of this court recommends a reversal for errors reassigned by him as arising out of:

"1. The admission by the trial court of certain declarations made by the deceased, on the ground that they formed part of the *res gestae.*

"2. The admission also by the trial court of a statement made by the deceased to the Municipal Judge of Cabo Rojo which was introduced as a dying declaration and admitted by the court."

We quite agree with the court below, with counsel for appellant, and with the *fiscal* of this court that the so-called dying declaration was inadmissible as such, and we find nothing whatever in the record to indicate that it was so admitted.

The *fiscal* insists that this document was admitted in evidence "because the court understood that it was a part of the *res gestae,* and over the objection of defendant." But no reference is made to any page or portion of the record where any such reason is assigned by the court for the admission of the writing in question or where any objection to its admission on such grounds was made by defendant. Nor do we find any satisfactory basis for the conclusion reached by the *fiscal.*

The portion of the record relied upon by appellant in the second proposition submitted by him has nothing whatever to do with the admission of documentary evidence, as we have already shown. The method employed by counsel for appellant in order to give a different aspect to what actually occurred in the court below only serves to emphasize the point last mentioned.

The *fiscal* also assumes that the document in question embodies the statement said to have been made by Rosario at seven o'clock or half past seven in the evening. But as we likewise heretofore pointed out, the municipal judge testified that the first of the two statements made before him was made in the presence of the attending physician and

the second in the presence of the chief of police and the secretary of the municipal court, both of whom attest the writing now under consideration.

It is of course conceivable that the document might have been offered by the *fiscal* as a part of the *res gestae,* at the close of the evidence for the defense, and that defendant objected thereto notwithstanding the absolute silence of the record as to any such offer and objection. But the writing is referred to as "the evidence admitted by the court," immediately following and obviously referring to a ruling just made and objected to by defendant to the effect that "the evidence is admissible." And it would be passing strange if after several pages of discussion as to the admissibility of evidence offered by defendant to show the bad. character and previous record of deceased, defendant should take exception to a ruling that such evidence was admissible. It would be stranger still if at the close of such a discussion the trial judge, without ruling upon the question under consideration, without announcement or the remotest intimation of an intention to rule upon any other matter, should say, with reference to a dying declaration offered as a part of the *res gestae* and excluded during the earlier part of the trial, and in the absence of any renewal of such tender, "the court rules that the evidence is admissible."

It would be interesting to know whether or not the trial judge commented upon this alleged dying declaration as a part of the *res gestae* in charging the jury, but the instructions given at the close of the trial are not included in the record now before us. And, be this as it may, the decision of this case does not depend upon the proposition that the document in question was not admitted in evidence. It is enough that defendant is not shown to have objected to the admission thereof at the time of such admission, or to have taken an exception to the ruling of the court upon such

objection if there was any objection and ruling in this regard.

On the other hand, if the so-called dying declaration was never in fact admitted in evidence, the investigation and determination of the manner and circumstances in which the document came to be included in the transcript of the evidence may be left to the sound discretion of the court below and the Department of Justice.

The testimony of Remedio López was merely cumulative to that of José Luciano already admitted without objection or protest on the part of defendant. In fact it was but another version or paraphrase of the same statement made at the same time in the presence of both witnesses and of the attending physician.

The testimony of the physician tended to show that Rosario because of his intoxicated condition and the effect of the shock produced by the wound was not capable of making a coherent or intelligible statement, and did not in fact make the statement in question. If Luciano and the policeman told the truth then the doctor must have been mistaken at least in so far as the actual making of the statement is concerned. The physical and mental condition of the patient in so far as it affected his ability to give a clear account of what had occurred was a matter going to the probative force of the statement actually made by him rather than to its admissibility in evidence. Moreover, if Rosario within less than half an hour after the shooting as a result of the shock and intoxication was unable to give a clear and reasonably accurate account of what had actually occurred, then a fair inference would seem to be that in like or even greater degree was it impossible for him to have conceived and invented an utterly false yet plausible narrative in this regard.

In any event the question as to whether or not Rosario had sufficient time and opportunity in the circumstances

disclosed by the preliminary investigation above mentioned to reflect and to formulate a false statement was a matter primarily, and in so far as the admissibility of the evidence is concerned, to be determined by the trial judge. Whether or not Rosario made the statement imputed to him, and whether or not the statement if so made was true were questions of fact to be determined by the jury.

In *People* v. *Calventy*, 34 P.R.R. 449, we quoted with approval from Wigmore on Evidence the following paragraphs:

"This general principle is based on the experience that, under certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. The ordinary situation presenting these conditions is an affray or a railroad accident. But the principle itself is a broad one." 3 Wigmore, sec. 1747, p. 2250.

"The utterance must have been before there has been time to contrive and misrepresent, i. e. while· the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance: This limitation is in practice the subject of most of the rulings.

. "It is to be observed that the statements *need not be strictly contemporaneous* with the exciting cause; they may be subsequent to it, provided there has not been time for the exciting influence to lose its sway and to be dissipated. The fallacy, formerly entertained by a few courts, that the utterance must be strictly contemporaneous (post. sec. 1756), owes its origin to a mistaken application of the Verbal Act Doctrine. . ." Id. Sec. 1750, p. 2255–2256.

Here, as in the *Calventy Case,* we need not go so far as to adopt without qualification or reservation the further suggestion of Professor Wigmore that the question of admissibility should be left in all cases entirely to the discretion of the court below. But we find nothing in the brief of the *fiscal* in the instant case to justify a departure from the rule announced in *People* v. *Calventy* to the effect that in the absence of a clear abuse of discretion this court will not interfere with the application made by the trial judge of the general principle involved according to circumstances developed at the trial. Nor do we find any such abuse of discretion in the case at bar.

The judgment appealed from must be affirmed.